## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| JENNIFER COUTURE; RALPH GARRAMONE M.D. P.A. d/b/a GARRAMONE PLASTIC SURGERY, | Civil Case No.: 2:23-cv-00340 |
| Plaintiff, | HON. Sheri Polster Chappell, U.S.D.J. |
| vs. | **AMENDED COMPLAINT FOR DAMAGES** |
| DANESH NOSHIRVAN a/k/a @THATDANESHGUY; TIKTOK INC.; AND BYTEDANCE, INC., JOHN DOES 1-100, being fictitious names, and ABC CORPORATIONS 1-100 being fictitious names, | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiffs Jennifer Couture (hereinafter "Couture") and Ralph Garramone M. P. A. d/b/a Garramone Plastic Surgery ("Garramone"), by and through their attorney the Law Office of Patrick Trainor, Esq, LLC, as for their Complaint against defendants Danesh Noshirvan a/k/a @thatdaneshguy, TikTok Inc., and Bytedance, Inc., hereby alleges as follows:

### STATEMENT OF THE CASE

Danesh Noshirvan is a prolific cyberstalker and repeat offender who publishes a Tiktok account with 1.6 million followers known as *"@thatdaneshguy,"* as a fee-for-service online and telephonic cyberstalking

service to enrich himself with illicit profits, to humiliate his victims, and to mete out consequences that he deems appropriate.

TikTok is a unique social media platform for its use of short-form videos, but also because of its several in-app monetization features that enables users to purchase TikTok's proprietary in-app currency known as "coins" and then use the coins to purchase in-app gifts to "tip" and "gift" eligible Creators, *i.e.,* users with a large following. "*Eligible Creators"* redeem their accrued gifts for real cash through the TikTok exchange and TikTok takes a 50% cut of the Creator's cash payout as a commission fee.

Danesh's scheme is simple. He acquires videos where the subject was recorded in an argument with another, making an off-color joke, or supporting an unpopular position. Unless he is paid to determine otherwise, Danesh determines that the subject (his target) is the antagonist, and he takes up the case to help the "victim." Danesh then re-posts an edited version of the video, overlayed with a video clip of himself (TikTok refers to this as a "stitch") that "doxes" or discloses the target's personal identifying information, such as name, employer, contact information with the intent of inciting his followers to join him. Danesh's campaigns of rage and harassment often go offline, as happened here. After Danesh doxed Couture, on three separate occasions strangers visited Couture's mother's home looking for Couture.

2

Not all of Danesh's 1.6 million TikTok followers participate.  However, Danesh proclaims himself the "*Shah of Daneland,*" and among his TikTok followers exists a small subset of cult-like followers referred to as *"Danelanders."* To incite Danelanders, Danesh describes the target as an "anti-vaxer," "child abuser," or "anti-masker."  Remarkably Danelanders respond to Danesh's incitement and eagerly participate in his campaigns of online and telephonic harassment.  Danesh executed this playbook to conduct a months-long campaign of online and telephonic harassment and rage to attack Couture and Garramone at their homes and businesses in Cape Coral and Fort Myers.  During which he exploited TikTok's unique monetization to earn hundreds of thousands of dollars in in-app profits that he split 50/50 with TikTok.

## THE PARTIES

1.     At all times mentioned in this complaint, plaintiff Jennifer Couture, was and now is a citizen of the County of Lee, State of Florida.

2.     Ralph Garramone M.D. P.A. d/b/a Garramone Plastic Surgery ("Garramone") is a professional association organized and existing under the laws of the State of Florida.  Ralph Garramone is the sole member of the professional association, and he was and now is a citizen of the County of Lee, State of Florida.

3.     Upon information and belief Defendant Danesh Noshirvan a/k/a "@thatdaneshguy" (collectively referred to as "Danesh"), is an individual residing

3

in Mansfield, Pennsylvania, and a resident of, and domiciled in the Commonwealth of Pennsylvania.

4.      Tiktok, Inc., ("Tiktok") is a foreign corporation organized under the laws of the State of California with its principal place of business located at 5800 Bristol Parkway, Culver City, California, 90230.

5.      Bytedance, Inc. ("Bytedance") is a foreign technology corporation organized under the laws of the State of Delaware with its principal place of business located at 250 Bryant St., Mountainview, California 94041 and is the parent corporation of Tiktok.  (TikTok and Bytedance are hereinafter collectively referred to as "TikTok").

## JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

7.      The Court has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. § 1367(a).

8.      Venue is proper in the Middle District under 28 U.S.C. §§ 1391(b)(2), because a substantial part of the acts or omissions giving rise to the claims occurred in this district.

## INTRODUCTION

9.      Danesh Noshirvan is a prolific cyberstalker, harasser, and repeat offender who publishes Tiktok account *@thatdaneshguy,"* as a fee-for-service cyberstalking service.  Danesh advertises his cyberstalking service on his TikTok account profile under the banner *"Need someone identified?"* alongside the link to his CashApp mobile payment service.

10.     Defendant TikTok is a short-form video-sharing social media platform that provides the tools necessary for its users to edit, modify, and create short-form videos.  TikTok refers to users who post videos on its platform as "Creators."

11.     Danesh is a high-volume in-app revenue producer who refers to himself as the "*Shah of Daneland,"* and among *@thatdaneshguy's* 1.6 million TikTok followers, exists a small subset of cult-like followers referred to as *"Danelanders."*  Upon Danesh's incitement, *Danelanders* participate in his campaigns of online and telephonic harassment and rage.

**TIKTOK'S UNIQUE MONETIZATION FEATURES**

12.     Tiktok is a unique social media platform for its use of short-form videos and also because it offers several in-app monetization features, which enable TikTok to share the in-app revenue that *"eligible Creators"* generate through "tips" and "gifts."  In 2022, TikTok generated $1.5 billion in in-app

revenue and year-to-date 2023, TikTok has generated $205 million more in-app

revenue "than Facebook, Instagram, and Twitter combined."[1]

13.     TikTok's several in-app monetization features include its proprietary

virtual currency known as TikTok coins, "live gifting," "tips" in cash

denominations, and monthly subscription fees from its Live Subscription program

paid directly through TikTok.

14.     Tiktok's Creators Portal explains that coins, tips, and gifts provide

viewers the opportunity to pay creators for the video content they create:

> "The Video Gifts feature gives creators another opportunity to
> collect Diamonds by allowing their viewers to send a virtual
> gift in the comments section of a video.  TikTok awards
> Diamonds to creators based on the popularity of their videos,
> and a key metric that TikTok uses to assess the popularity of a
> video is the number of Gifts sent to a creator's content."
> https://www.tiktok.com/creators/creator-portal/en-us/getting-
> paid-to-create/video-gifts/ (last visited May 3, 2023).

15.     Importantly, not all creators are eligible to participate in TikTok's in-

app monetization features.  TikTok's in-app monetization features are restricted to

"*eligible creators*" that are 18 or older, have at least *100,000 followers*, an account

in good standing that is more than 30 days old, published a public video in the last

---

[1] John Koetsier, *TikTok Earned $205 Million More Than Facebook, Twitter, Snap And Instagram Combined On In-App Purchases In 2023*, Forbes.com (Mar. 1, 2023)**,** https://www.forbes.com/sites/johnkoetsier/2023/03/01/tiktok-earned-205-million-more-than-facebook-twitter-snap-and-instagram-combined-on-in-app-purchases-in-2023/?sh=7af8197142d4

30 days and can't have repeated violations of [TikTok's] Community Guidelines.[2]"

Community Guidelines prohibit harassing, humiliating, threatening, and doxing.[3]

16.    Tiktok's in-app monetization begins with its proprietary virtual currency known as "coins."  Users must purchase coins from the TikTok exchange with a credit/debit card, but coins have no monetary value outside of TikTok.



*Figure 1 Screen capture of TikTok's exchange as of May 3, 2023.*

17.    Coins are used to purchase virtual gifts that are gifted to eligible Creators.  Virtual gifts are emoji like figures, and each has a corresponding purchase value.  For instance, a "disco ball" costs the user 1,000 coins to purchase, whereas a "fire" costs the user 5 coins to purchase.

---

[2] TikTok Community Guidelines,  *Getting Paid to Create, Tips,* https://www.tiktok.com/creators/creator-portal/en-us/getting-paid-to-create/tips/ (last visited May 3, 2023);  *See also* TikTok Community Guidelines, *Video Gifts,* https://www.tiktok.com/creators/creator-portal/en-us/getting-paid-to-create/video-gifts/, (last visited May 3, 2023).
[3] TikTok Community Guidelines, *Community Guidelines*, Mar. 2023, https://www.tiktok.com/community-guidelines/en/ (last visited May 3, 2023).

18.    A small quirk in Tiktok's in-app monetization features is that users purchase coins and Creator's receive diamonds.  For example, the fire virtual gift that the user purchased for 5 coins is credited as 5 "diamonds" when gifted to a Creator.  Diamonds are what Creators redeem for real cash and like coins, diamonds have no monetary value outside of TikTok.

19.    "Tips" can also be paid to eligible Creators in cash.  When tipping cash, the user has the option of tipping "between a $5, $10, $15, or custom tip amount,"[4] and will "see the number of supporters and tips the creator has received" for his creativity.



*Figure 2 Option to tip cash.*



*Figure 3 Screen capture of TikTok tips and the tippers who paid to Danesh for cyberstalking Couture and Garramone.*

---

[4] TikTok Community Guidelines, *Getting Paid to Create, Tips, supra* note 2.

20.    "Live gifting" is tipping that occurs during a Creator hosted live event.

21.    In May 2022, TikTok launched "Live Subscription" a monthly subscription service that was open to a limited number of "invite-only" Creators.[5] Danesh was among the "invite-only" Creators chosen to participate.  His monthly subscription fee is $5.99.  *TikTok takes a 35% cut of Creators' Live Subscription monthly subscription fees.*



*Figure 4 Screen capture of Danesh's TikTok Live Subscription promotional event, where he acquired at least 24 subscribers who pay a $5.99 monthly fee to receive advance notice of his cyberstalking videos, one-to-one chats with Danesh, and related content.  TikTok takes a 35% cut of the subscription fee.*

\* \* \* \* \*

---

[5] TikTok Newsroom, May 23, 2022, *Exploring new ways for creators to build their community and be rewarded with Live Subscriptions,* https://newsroom.tiktok.com/en-us/live-subscription-invite-only (last visited May 3, 2023).

22.     Eligible Creators redeem their accrued TikTok "diamonds" for real cash through the TikTok exchange.  The in-app redemption value of a diamond is a nickel ($.05).  For facilitating the redemption, TikTok charges Creators a 50% commission fee.[6]  For instance, when a Creator redeems 50,000 diamonds, he receives $250.00 (50,000 x .05), TikTok keeps the first $125.00 (25,000 diamonds x .05) as its 50% commission, and deposits the remaining $125.00 (25,000 diamonds x .05) into the Creator's PayPal account.

23.     In-app revenue is a two-way revenue stream for TikTok.  TikTok generates front-end revenue when users purchase TikTok coins, and then a 50% commission on the back end when Creators redeem their gifts for cash.  TikTok's two-way in-app revenue generation model incentivizes identification and promotion of Creators, who generate in-app revenue, and differs from other social media platforms that rely on the much broader revenue generation focus of the advertiser-supported model.[7]

24.     Danesh is a high-volume in-app revenue producer, who has exploited TikTok's in-app revenue to earn hundreds of thousands of dollars documenting his

---

[6] Prachi Mishra, *How Does TikTok Work & Make Money*, Fedough.com, (Mar. 24, 2023) https://www.feedough.com/tiktok-business-model-how-does-tiktok-make-money/

[7] Greg McFarlane, Thomas J. Catalano, Vikki Velasquez, *How Facebook (Meta), X Corp (Twitter), Social Media Make Money From You*, Investopedia.com, (Dec. 2, 2022), https://www.investopedia.com/stock-analysis/032114/how-facebook-twitter-social-media-make-money-you-twtr-lnkd-fb-goog.aspx#toc-other-ways-social-media-companies-make-money.

cyberstalking campaigns and inciting *Danelanders* to join his cyberstalking

campaigns.

## TIKTOK'S BUSINESS IS TO KNOW WHAT YOU WATCH AND WHY

25.    TikTok relies on extensive in-app and off-app online surveillance to

collect the data that feeds its algorithms that operate its systems that recommend

the Creators and content shown in each user's unique "For You Feed."  New data

is collected every time a user visits TikTok to constantly update its algorithms in

order to keep pace with a user's evolving interests.

26.    TikTok knows the device you are using, your location, IP address,

search history, content of your messages, what you view and for how long, and

your interactions with advertisers.[8]  TikTok's iPhone app can "monitor all

keystrokes, text inputs and screen taps."[9]  In the United States, TikTok's

algorithms can collect biometric data, including faceprints and voiceprints from

user content.

27.    TikTok's off-app data collection includes embedding "pixels" in

consumer websites to collect data about the visitors to the websites, including the

---

[8] Kate O'Flaherty, *All the ways TikTok tracks you and how to stop it*, Wired.co.uk, (Oct. 10, 2021), https://www.wired.co.uk/article/tiktok-data-privacy

[9] Rafqa Touma, *TikTok can track users' every tap as they visit other sites through iOS app, new research shows*, theguardian.com, (Aug. 24, 2022) https://www.theguardian.com/technology/2022/aug/24/tiktok-can-track-users-every-tap-as-they-visit-other-sites-through-ios-app-new-research-shows

device type, location, IP address, search history, content of messages, what he viewed and for how long, and the user's interactions with advertisements.[10]

28.    As soon as a person opens TikTok, even a non-user, TikTok installs cookies and trackers to collect the user's device type, location, IP address, search history, content of messages, what he viewed and for how long, and the user's interactions with advertisers.  When an account is created, TikTok also collects user email addresses and contacts from Facebook, Twitter, Instagram, and Google. To identify a user's friends and family, TikTok's algorithms cross-reference the user in the data of other users' content, direct messages, information submitted to TikTok, and publicly available sources.

29.    TikTok's algorithms infer the users age, gender, and the nature of the user's interests, such as whether he likes sports, politics, religion, or skydiving from the data collected.

30.    Unlike other social media platforms, TikTok's algorithms collect data on passive interactions, such as why the user watched a particular video, how many times the user let a video replay, how quickly the user scrolled past a video, the

---

[10] Thomas Germain, *How TikTok Tracks You Across the Web, Even If You Don't Use the App,* Consumerreports.org, (Sep. 29, 2022), https://www.consumerreports.org/electronics-computers/privacy/tiktok-tracks-you-across-the-web-even-if-you-dont-use-app-a4383537813/

type of content the user skipped, and whether the user was drawn to a particular category of effects and sounds.[11]

31.    To control the nature of the content posted, before a video goes live it is moderated by TikTok's human and algorithmic moderators, who review the videos sounds, hashtags, and captions.  TikTok's algorithmic moderation can so effectively identify the nature of content that it was used to suppress videos posted by Creators that TikTok deemed too ugly, too poor, were disabled, had beer bellies, or crooked smiles and prevented them from posting.[12]

32.    TikTok's algorithms detect and remove videos with harmful content. For instance, TikTok's algorithms do not remove videos that promote positive challenges like the "ice-bucket challenge," which raises money for charities that support finding the cure for Lou Gehrig's disease, however, TikTok's algorithms detect and remove videos that encourage teenagers to attempt harmful challenges, like the milk-crate challenge, where a person attempts to walk over a pyramid of untethered milk crates, or the dry scooping challenge, where a person attempts to eat a scoop of dry protein powder, or the blackout challenge.

---

[11] Xueyin Zha, *The unique power of TikTok's algorithm*, https://www.lowyinstitute.org/the-interpreter/unique-power-tiktok-s-algorithm, Lowyinstitute.org (Oct. 7, 2020).
[12] Sam Biddle, Paulo Victor Ribeiro, Tatiana Dias, *Invisible Censorship, TikTok Told Moderators to Suppress Posts by "Ugly" People and the Poor to Attract New Users*, https://theintercept.com/2020/03/16/tiktok-app-moderators-users-discrimination/ (Mar. 16, 2020).

33.     TikTok became the world's largest social media platform, because its powerful algorithms know what you like and why you liked it.

## FACTUAL ALLEGATIONS

34.     Prior to the instant cause of action, Couture and Danesh were complete strangers.  They reside approximately 1,300 miles apart and their lives had never intersected.

35.     Danesh is a prolific cyberstalker, harasser, and repeat offender who operates *"@thatdaneshguy,"* as a fee-for-service cyberstalking service.

36.     Danesh's scheme is simple.  He sources videos from a variety of sources, including from people who pay him an upfront fee.  In these videos the subject is recorded in an argument with another, making an off-color joke, or supporting an unpopular position.  Unless he is paid to determine otherwise, Danesh determines that the subject (his target) is the antagonist, and he takes up the case to help the "victim."  Danesh then re-posts an edited version of the video, overlayed with a "stitched" in video clip of himself that "doxes" the target's personal identifying information ("PII"), such as name, employer, contact information.  People who pay Danesh's upfront fee typically provide the video and the target's PII.

37.     To incite Danelanders to join him, Danesh describes the target as an "anti-vaxer," "anti-masker," or a "white supremacist," regardless of the truth of

this description, and announces the acts to come by singing "*here comes the*

*consequences, consequences…*"

38.     Obviously, not all of Danesh's 1.6 million followers participate, but Danelanders comprise a small cult-like subset of his followers and financial supporters, who respond to Danesh's incitement and eagerly participate by making scores of harassing, abusive, rage-filled, and often threatening emails, phone calls, voicemails, social media postings directed at the target, including fictitious negative professional reviews on sites like Yelp and Google reviews.

39.     On or about January 26, 2022, Couture was recorded arguing with a person in a parking lot.  That same day an unrelated minor-teenager provided Danesh a copy of the video of Couture arguing, along with Couture's personal identifying information, and paid Danesh a fee.  Upon reason and belief, the fee paid to Danesh totaled *$5,000.00*.


* * * * *

40.     On or about January 27, 2020, Danesh posted his first video that
targeted Couture, which incited Danelanders' to join his campaign of online and
telephonic harassment and rage.



*Figure 5 Screen capture from Danesh's first TikTok video doxing Couture, wherein he incited Danelanders to participate.  Video accumulated 7 million views.*



*Figure 6 Screen capture of video posted by a Danelander in the act of making joining Danesh's cyberstalking and making a harassing call to Couture's employer.*

41.     Couture immediately received hundreds of abusive and threatening
text messages (no fewer than 728) from unknown numbers, plus a constant stream
of rage-filled phone calls and voicemails to her personal and professional phone
numbers, where the caller screamed *"die you dumb cunt,"* or *"eat shit and die, kill
yourself."*  Similar statements were sent to her emails and social media.  Many
Danelanders posted videos of themselves in the act as seen above in *Figure 6*.  The
initial burst lasted for several days.

* * * * *



*Figure 7 Screen capture of a text message received by Couture's phone from an unknown number after Danesh's video incitement.*



*Figure 8 Screen capture of a text message received by Couture's phone from an unknown number after Danesh's video incitement.*

42.     Danesh's video incited a Daneland feeding frenzy, and they conducted invasive searches into Couture for any maiden/married names, family members, addresses of her family members, schools her children attended, employer's name, etc., then contacted all.



*Figure 9 Screen capture showing 3284 comments beneath Danesh's initial TikTok video documenting Danelanders deep dive into Couture and her family.*



*Figure 10 Screen capture of Danesh thanking Danelanders for confirming Couture's identity following the publication of his initial video.  Name of minor child was redacted.*

17

43.    Couture turned out to be a popular victim for Danesh.  Within two weeks of instigating the campaign against Couture, Danesh increased his TikTok followers from approximately 702,000 to more than 1 million.

44.    Couture was not a TikTok user when the campaign was directed at her.  She instinctively deleted abusive social media comments, blocked abusive phone numbers, and began closing accounts.  Danesh immediately discovered her deletions and became enraged.  He messaged Couture directly and threatened her that the "fun hasn't even started yet," and that much worse was to come from his "1.3 million fams."  Danesh is a complete stranger.



*Figure 11 Danesh's direct message to Couture that the fun hasn't even started.*

45.    On January 27, 2022, as Danesh's video accumulated millions of views and Couture was being attacked, she also received many supportive messages from strangers, and many complained to TikTok about Danesh's video.

Danesh then posed as a concerned bystander and sent Couture a supportive

message on Facebook under the fictitious name Erica Sabonis.



*Figure 12 Text message of Danesh posing as Erica Sabonis*

46.    The message was a fishing expedition to capture Couture's reaction,

which he used in a new video, wherein he admitted he was Erica Sabonis and

mocked Couture for falling for his ruse.



*Figure 13 Screen capture of Danesh's TikTok video wherein he admitted
he was Erica Sabonis.*

47.    After his initial video, Danesh posted several new videos successively.  On January 28, 2022, January 30, 2022, January 31, 2022, February 1, 2022, followed by May 8, 2022, and May 13, 2022, each with further personal details and each incited Danelanders to engage to direct hundreds of rage-filled statements such as "die you dumb cunt," or "eat shit and die, kill yourself" to Couture.

48.    Simultaneously, Danesh purchased other forms of media to promote and expand the reach of his videos and cyberstalking campaign against Couture.

49.    On or about February 22, 2022, Danesh purchased native content sponsored advertisements ("native content"), which are commissioned ads designed to look like real news articles.  Danesh paid to publish in the online edition of the *International Business Times of Singapore (ibtimes.sg),* and they were republished in news and media sites like *Dexerto.com* and *wegotthiscovered.com,* and numerous others*.*  In these articles, Danesh identifies himself as the person who instigated the cyberstalking against Couture, admitted the Erica Sabonis ruse, quotes himself as an authority figure, and disclosed that Garramone was Couture's employer.

50.    Danesh embedded links to the native content in videos directed at Couture so they would cross-reference each other to increase their search rankings, thereby gaining more views.  Danesh leveraged the native content ads: (1) to

increase the popularity of the videos about Couture by increasing their TikTok and search engine rankings; (2) to acquire new followers to *@thatdaneshguy* by linking to it from the native content; (3) to increase his profits through the acquisition of additional followers; and (4) to maximize Couture's humiliation by positioning his videos as the first result when someone performs an internet search for her name.

51.     Between January 2022 and August 2022, Danesh posted approximately twelve (12) new videos directed at Couture and repeatedly edited and re-posted his previous videos.

52.     In July 2022, the attacks against Couture extended beyond online and telephonic attacks into the real world when an anonymous report that alleged Couture had harmed her minor child and that her minor child was in danger of ongoing harm was filed with the Florida Department of Children and Families ("Florida DCF").

53.     As a result of the anonymous allegations, in August 2022, investigators from the Florida DCF made an unannounced investigative visit to Couture's home.  During which, Couture was segregated from her minor-child, and they were interviewed separately.

54.     Couture was immediately cleared of the outrageous false allegations, but this horrific invasion of her mother-child relationship has obviously caused her to suffer tremendous lasting and persistent emotional distress and fright.

55.     It was since discovered that Danesh filed the anonymous allegations that triggered the Florida DCF investigation, and that during July and August 2022, Florida DCF received hundreds of anonymous reports alleging the same unsubstantiated claims against Couture.  The unusually high number of anonymous reports is indicative Danelanders' conduct.

56.     Danesh has a history of making unsubstantiated claims of child abuse against his targets.  In or about September 2021, Danesh claimed a satirical video posted by another Creator was "normalizing child abuse."  He responded by posting a video that doxed the creator and explained that he had reported that Creator to child protective services in the State of Oklahoma.  The video incited Danelanders to make similar allegations against the Creator.  TikTok then terminated @thatdaneshguy for violating TikTok's guidelines against doxing and harassment.

57.     When Danesh's account was terminated, Danelanders conducted a mass appeal of his termination, and TikTok fully reinstated Danesh with his followers intact.[13]

---

[13] Siobhan Bell, *I have children and I could never imagine doing that: One TikToker's crusade against child abusers,* https://www.dailydot.com/unclick/danesh-tiktok-crusade-against-child-abusers/, Dailydot.com, (Sep. 24, 2021)

58.     Danesh has also incited Danelanders to report her to Southwest

Florida Crimestoppers, because "[c]rimestoppers will pay you" for her arrest.





*Figure 14 Screen capture from Danesh's TikTok video wherein he instructs Danelanders to anonymously report Couture to Crimestoppers for fictitious crimes.*

*Figure 15 Comments beneath Danesh's video suggesting Danelanders report Couture to Crimestoppers, wherein he suggests Crimestoppers will pay them for her arrest.*

59.     There is a familial link between Couture and Garramone's principal,

which Danesh doxed in a video on January 28, 2022.





*Figure 16 Screen Capture of Danesh TikTok video wherein he confirmed Garramone is Couture's employer.*

*Figure 17 Screen capture of Danesh and Danelanders confirming that the scope had expanded to include attacking Garramone.*

47.     Once the Couture-Garramone familial link was published,

Danelanders immediately turned fire on Garramone, and Garramone received

hundreds of rage-filled calls, text messages, emails, and fictitious negative reviews

posted on professional review sites.



*Figures 18-20 Screen captures of fictitious reviews posted to Garramone's Google review page by Danelanders. See also figure 17, wherein Danesh and Danelanders confirm directing attack at Garramone.*

48.     The attack was akin to brute force computer hacking attack, and

paralyzed Garramone's surgical practice.

49.     Garramone replied to one of the fictitious Google reviews by stating

that neither Danesh, nor any Danelanders posting fake reviews were former or

current patients.

50.     Danesh immediately noticed Garramone's comment, and published a video directed at Garramone, wherein he claimed that Garramone was slandering him, and included Garramone's financial information in the video, which incited Danelanders to defend Danesh.



Figure 21 Screen capture of Danesh's video featuring Garramone's response to fictitious negative post.



Figure 22 Screen capture of Garramone's financial information posted by Danesh.

51.     Danesh subsequently posted new videos directed at Garramone on January 30, 2022, and January 31, 2022, and as with the Couture's videos, Danesh edited and re-posted the Garramone videos repeatedly between January 2022 and July 2022.  Danesh's new videos purposely mischaracterized lighthearted photographs in an effort to defame Garramone.

52.     Danesh's cyberstalking campaign against Garramone severely damaged their reputation and caused significant financial harm.  Garramone was forced to prematurely terminate contracts with surgeons, who became fearful of

25

reputational harm by being swept into Danesh's net, and many patients terminated scheduled procedures and ended their relationship.

53.    Danesh's harassment of Couture and Garramone is particularly indefensible.  He is a complete stranger.  There never existed a legitimate reason or purpose for Danesh to communicate with Couture or Garramone.  Danesh simply profited from harassing Couture, and when he learned of the Couture-Garramone link he extended his campaign to Garramone and incited Danelanders to join his campaigns of online and telephonic harassment.

54.    Danesh has also expressed a desire to humiliate and levy consequences against his victims.  During an appearance on the Dr. Phil television show titled *"Caught on Camera: Have we lost our privacy?"*  Danesh expressed no concern for the impact on his victim even when Dr. Phil asked about the possibility that one of his victims might harm themselves as a result of his actions. Danesh stated that identifying and humiliating his target was his goal, because it was important that the target receives the accountability that he feels they deserve.

\* \* \* \* \*



*Figure 23 Screen capture of Danesh's appearance on Dr. Phil where he stated identifying and humiliating his target is necessary for him to give people the consequences they deserve.*



*Figure 24 Screen capture of Danesh's TikTok account, wherein he published his appearance on Dr. Phil to generate gift income.*

55.     Danesh and Danelanders are notorious for violating community guidelines and well known to TikTok for their conduct.  Danesh has accumulated strikes for doxing and was previously terminated for doxing and harassing others. Danesh was only reinstated after Danelanders lodged a successful mass appeal.

56.     Danesh and Danelanders are so prolific and their conduct so well known that their victims have documented their experiences in videos posted under two separate categories, which have collectively been viewed more than 7.5 million views: (1) *#danelandisdangerous* and (2) *#victimsofdaneland*.



*Figure 25 #danelandisdangerous has been viewed more than 5.7 million times.*



*Figure 26 #victimsofdaneland has been viewed more than 1.8 million times.*

57.     When asked what his motives or about what percentage of his profits goes to help the "victims" that Danesh claims to help, he demeans the questioner and Dandelanders rush to defend Danesh claiming that Danesh deserves to be paid, because he does "a lot of work."



*Figure 27 Screen capture of the comment section of @thatdaneshguy where Danesh earns profits from cyberstalking.*



*Figure 28 continuation of comment section from Figure 26, wherein Danelanders confirm that his cyberstalking profits are valid, and Danesh suggests some of the proceeds from his branded merchandise goes to charity.*

58.     Danesh led and conducted online and telephonic campaigns of harassment and rage against two complete strangers for illicit financial and to satisfy his desire to humiliate his victims and inflict consequences that he deemed appropriate.

\* \* \* \* \*

## <u>COUNT I – CYBERSTALKING</u>

59.     This is an action for damages for cyberstalking pursuant to Section 748.048(1)(d)(1) of the Florida Statutes against Defendants Danesh Noshirvan a/k/a "@thatdaneshguy," TikTok, Inc., and Bytedance, Inc.

60.     Couture and Garramone reallege and incorporate herein the allegations set forth in Paragraphs 1 through 59 as if set forth more fully herein.

61.     Pursuant to Section 784.048(1)(a) to "harass" someone means to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose.

62.     Pursuant to Section 784.048(1)(b) a "course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose.

63.     Section 748.048(1)(d)(1) defines "cyberstalking" as "to engage in a course of conduct to communicate, or to cause to be communicated, directly or indirectly, words, images, or language by or through the use of electronic mail or electronic communication, directed at or pertaining to a specific person."

64.     Pursuant to Section 784.048(2) a person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking.

65.     Plaintiffs are the victims of cyberstalking conducted by defendant Danesh Noshirvan.  Plaintiffs have been harassed and cyberstalked in accordance with the definitions set forth in Section 748.048(1)(d)(1).

66.     Danesh Noshirvan engaged in a course of conduct to communicate, and to cause to be communicated online and telephonic cyberstalking campaigns of harassing, defamatory, and abusive attacks on Jennifer Couture and Garramone Plastic Surgery via social media platform TikTok, Inc., for financial profits, which were shared with TikTok.

67.     Defendant Danesh Noshirvan engaged in a course of conduct on TikTok that incited Danelanders to participate in his online and telephonic cyberstalking campaigns of harassing, defamatory, and abusive attacks on Jennifer Couture and Garramone Plastic Surgery and incited them to submit hundreds of false allegations of child abuse to the Florida DCF.

68.     Defendant Danesh Noshirvan engaged a course of conduct directed at Plaintiffs Jennifer Couture and Garramone Plastic Surgery at their homes and businesses in Cape Coral and Fort Myers via social media platform TikTok, Inc., mobile phone text messaging, telephone systems, emails, and internet review websites to incite campaigns of online and telephonic harassment and rage to be directed against Couture and Garramone in prolonged attacks.

69.    Danesh Noshirvan paid to publish native content in the online version of International Business Times of Singapore in order to expand the reach of his online and telephonic harassment Couture and Garramone to acquire new followers and increase his profits.

WHEREFORE, Plaintiffs Jennifer Couture and Garramone Plastic Surgery, Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, emotional distress, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and for such other relief as the Court deems just and proper.

## COUNT II – CIVIL CONSPIRACY

### (As to Jennifer Couture)

70.    This is an action for damages by Plaintiff Jennifer Couture against Defendants Danesh Noshirvan a/k/a "@thatdaneshguy," TikTok, Inc., and Bytedance, Inc., for damages for civil conspiracy in excess of $75,000.00, exclusive of interest and costs.

71.    Plaintiff Jennifer Couture realleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 70 as if set forth more fully herein.

72.     Defendants agreed to participate in a conspiracy to earn profits by conducting campaigns of online and telephonic harassment against Jennifer Couture.

73.     Defendants each had knowledge of, and participated in campaigns of online and telephonic harassment and cyberstalking of Jennifer Couture with the intent to damage her business and professional reputation, and to tortiously interfere with the business relationship between Jennifer Couture and her clients.

74.     Defendants knew the online and telephonic harassment and cyberstalking campaigns would likely result in material and substantial damage to Jennifer Couture.

75.     Jennifer Couture suffered damages as a direct and proximate result of Defendants' online and telephonic cyberstalking campaigns.

WHEREFORE, Plaintiff Jennifer Couture, demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, emotional distress, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and for such other relief as the Court deems just and proper.

## COUNT III – CIVIL CONSPIRACY

### (As to Garramone Plastic Surgery)

76.    This is an action by Plaintiff Garramone Plastic Surgery against

Defendants Danesh Noshirvan a/k/a "@thatdaneshguy," TikTok, Inc., and

Bytedance, Inc., for damages for civil conspiracy in excess of $75,000.00,

exclusive of interest and costs.

77.    Garramone Plastic Surgery realleges and incorporates herein by

reference the allegations set forth in Paragraphs 1 through 76 as if set forth more

fully herein.

78.    Defendants agreed to participate in a conspiracy to earn profits by

conducting campaigns of online and telephonic harassment against Plaintiff

Garramone Plastic Surgery.

79.    Defendants each had knowledge of and participated in campaigns of

online and telephonic harassment, cyberstalking, and publication of defamatory

statements against Garramone Plastic Surgery with the intent to damage the

business and professional reputation of Garramone Plastic Surgery and to

tortiously interfere with the business relationship between Garramone Plastic

Surgery and its patients and clients.

80.    Defendants knew the defamatory statements would likely result in

material and substantial defamation and damage to Garramone Plastic Surgery and

its business.

81.    The Defamatory statements by Defendants to third parties imputed that Garramone Plastic Surgery was engaged in conduct, characteristics, and conditions incompatible with the proper exercise of Garramone Plastic Surgery's lawful surgical practice.

82.    Garramone Plastic Surgery suffered damages as a direct and proximate result of the actions of the Defendants aiding and abetting the making and publishing of the defamatory statements.

WHEREFORE, Plaintiff Garramone Plastic Surgery, demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, emotional distress, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and for such other relief as the Court deems just and proper.

## COUNT IV –INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

83.    This is an action by Plaintiff Garramone Plastic Surgery against Defendants Danesh Noshirvan a/k/a "@thatdaneshguy," TikTok, Inc., and Bytedance, Inc., for damages for tortious interference with a business relationship in excess of $75,000.00, exclusive of interest and costs.

84.     Plaintiff Garramone Plastic Surgery realleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 83 as if set forth more fully herein.

85.     At all times material to this action, Garramone was a professional association and licensed medical practitioner in the State of Florida rightfully entitled to pursue its lawful business interests.

86.     Defendants were aware of the existing business relationships between Garramone and their clients and interfered with those existing relationships as described above.

87.     Defendants used wrongful means to interfere in Garramone's relationships with prospective clients by creating fictitious defamatory reviews on professional review website, thereby tortiously interfering with Garramone's prospective economic relationships with such prospective customers, all to Garramone's tremendous detriment and harm.

88.     As set forth above, Defendants have conspired with each other to use wrongful means to maliciously, and without justification, interfere with Garramone's right to lawfully pursue its business interests.

89.     As a result of Defendants' intentional and malicious interference as aforesaid, Garramone has lost lucrative, prospective relationships and revenue, together with the expectation of future economic gain.

90.     Without any legal justification for their actions Defendants intentionally and unjustifiably interfered with Garramone's rights to pursue its lawful business interests.

91.     As a consequence of Defendants' intentional and malicious interference with Garramone's contract and/or prospective economic advantage, Garramone has suffered and will continue to suffer immediate and irreparable harm and damages.

WHEREFORE, Plaintiff Garramone Plastic Surgery, Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, emotional distress, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and for such other relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

Dated: May 30, 2023

/s/ Patrick Trainor
_____
Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC**
19 Union Avenue, Suite 201

Rutherford, New Jersey 07070
P: (201) 777-3327
F: (201) 896-7815
pt@ptesq.com
*Attorney for Plaintiffs*