## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

CASE NO. 2:23-cv-00340-SPC-KCD

JENNIFER COUTURE; RALPH GARRAMONE M.D. P.A. d/b/a GARRAMONE PLASTIC SURGERY,

    Plaintiffs,

v.

DANESH NOSHIRVAN a/k/a @THATDANESHGUY,

    Defendant.

## PLAINTIFF RALPH GARRAMONE M.D., P.A., D/B/A GARRAMONE PLASTIC SURGERY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW

Plaintiff RALPH GARRAMONE M.D., P.A., d/b/a GARRAMONE PLASTIC SURGERY ("*GPS*"), files this Motion for Partial Summary Judgment on Liability and Incorporated Memorandum of Law, pursuant to Federal Rule of Civil Procedure 56, and in support respectfully states as follows:

## I.   INTRODUCTION

Defendant Danesh Noshirvan ("*Noshirvan*") is a self-described social media mega-influencer with approximately 2.5 million followers across multiple platforms. Noshirvan used his social media accounts to identify and publicly target individuals online. After targeting Jennifer Couture ("*Couture*"), GPS's office manager, following

a recorded and well-publicized incident involving Ms. Couture, Noshirvan launched a years-long campaign of online and telephonic harassment against Couture and, upon learning of her employment with GPS, expanded his campaign to GPS ostensibly for not terminating Ms. Couture's employment. This Court has recognized that "[m]any of [Noshirvan's] millions of followers then harass the person" he targets, which is precisely what happened here. Order on Motion to Dismiss (D.E. 81 at 2). Indeed, in sanctioning Noshirvan, the Court in the related proceeding (the "*1218 Case*") found that Noshirvan's inflammatory communications were "intentionally made to incite followers to engage in foreseeable harassment and intimidation" and that, "[p]redictably, Noshirvan's communications led to harassment." Opinion & Order, *Noshirvan v. Couture, et al.*, No. 2:23-cv-1218-JES-KCD (M.D. Fla. Aug. 12, 2025) (D.E. 454 at 25, 30).[1]

Noshirvan conspired with A.O., a former GPS employee, and others, and incited his followers to join in a coordinated effort to damage GPS's business and professional reputation. Using confidential information about GPS's business operations, patients, and the personal lives of Dr. Ralph Garramone ("*Dr. Garramone*") and Couture, Noshirvan utilized this information to maximize the financial and reputational damage inflicted on GPS. The undisputed evidence shows that Noshirvan, in concert with A.O. and his followers, engaged in a deliberate and

---

[1] The Court has recognized that the 1218 Case is "related" to this action.  D.E. 195, 205, 208, and 211.  Further, both cases have a final pretrial conference set for November 20, 2026 and trial on the November 30, 2026 calendar.

coordinated campaign that resulted in GPS's patients cancelling scheduled procedures and ending their relationship with the practice, a physician leaving GPS's practice due to reputational harm, and ongoing financial harm to the business.

As detailed herein, the record consists of undisputed evidence satisfying each element of GPS's claims for civil conspiracy (Count II) and tortious interference with a business relationship (Count III). GPS seeks partial summary judgment on the issue of liability only[2]. There are no genuine issues of material fact, and GPS is entitled to judgment as a matter of law.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Relationship of the Parties

1.    GPS is a professional association organized under the laws of the State of Florida and has been in operation since 2000. *See* Declaration of Dr. Ralph Garramone as Corporate Representative of GPS ("***GPS Decl.***"), attached as Exh. A, at ¶ 2. *See also* Dr. Garramone's deposition in the 340 Case at 351:16-18[3].

2.    GPS operates both a plastic surgery practice performing facial and body surgeries and a medical spa ("***medspa***") offering services including laser treatments, Botox, and facials. The nature of GPS's business is heavily dependent on reoccurring

---

[2] The amount of damages GPS sustained and its request for an injunction to stop Noshirvan from continuing to target GPS and to remove social media posts targeting GPS will be addressed at trial.

[3] The complete transcript of GPS's deposition has been previously filed under seal in the 1218 Case at D.E. 480 and will be referred to herein as the "GPS Dep. (D.E. 480)."

patient relationships who return for follow-up procedures, ongoing medspa treatments, and maintenance services over the course of months and years. GPS's continued success depends on maintaining long-term relationships with its existing patient population, having referrals from patients to others, and having referrals from other physicians. GPS Decl., at ¶ 4.

3.　　Couture is an employee of GPS and works as its office manager. *See* Declaration of Jennifer Couture ("***Couture Decl.***"), attached hereto as Exh. B, at ¶ 1; GPS Decl., at ¶ 3; Jennifer Couture's deposition at 13:11-15.[4]

4.　　GPS maintained exceptional goodwill and reputation in the community through Dr. Garramone's work as a lauded plastic surgeon. GPS Decl., at ¶ 5.

5.　　Noshirvan has been referred to as an online social media mega-influencer and he has approximately 2.5 million followers across all his social media accounts, including, but not limited to, Instagram, Facebook, TikTok, and Substack. *See* Danesh Noshirvan's April 25, 2025 deposition transcript at 21:15-22:6, 49:4-22, 115:20-116:6.[5]

6.　　Before January 26, 2022, Noshirvan, GPS, Dr. Garramone, and Couture were complete strangers. GPS Decl., at ¶ 6; Couture Decl., at ¶ 3.

---

[4] The complete transcript of Couture's deposition from the 1218 Case has been previously filed under seal at D.E. 476 and will be referred to herein as "Couture Dep. (D.E. 476)."

[5] The complete transcript of Danesh Noshirvan's April 25, 2025 deposition has been previously filed under seal in the 1218 Case at D.E. 473 and will be referred to herein as "Noshirvan 1218 Dep. (D.E. 473)."

**B.    Noshirvan's Initial Targeting of Couture and GPS**

7.    Noshirvan utilized his social media accounts to identify and publicly target individuals online. Noshirvan admitted that he contacted targets under fictitious names to confirm their identities, and that he maintained "sock puppet" accounts for this purpose. Danesh Noshirvan's July 26, 2024 deposition ("*Noshirvan 340 Dep.*"), attached hereto as Exhibit C, at 29:13-30:15, 52:19-53:6.

8.    On or about January 26, 2022, Noshirvan received a copy of a video depicting Couture arguing with another person in a parking lot. Noshirvan then engaged in deceitful conduct to confirm Couture's identity: using what he admitted was a "sock puppet account" (a fake account) under the alias "Erica Sabonis." Noshirvan contacted Couture through Facebook, posing as Erica Sabonis, a concerned person who warned Couture she was being "doxxed" online, and tricked Couture into confirming her identity. Noshirvan 340 Dep. at 30:1-15, 52:19-53:6; Couture Decl., at ¶ 4.

9.    In his deposition, Noshirvan admitted that Couture "confirmed it herself" and "flat out said it was her" when he contacted her through the fictitious Erica Sabonis account. Noshirvan 340 Dep. at 69:7-70:4. Noshirvan separately admitted in messages with a follower that he "tricked [Couture] into confirming her name." Couture Decl., at ¶ 7; GPS Decl., at ¶ 14.

10.    On or about January 27, 2022, Noshirvan published his first video targeting Couture, in which he disclosed her personally identifiable information ("*PII*"), including her name and her employer, GPS, and incited his followers to join

5

his campaign of online and telephonic harassment against Couture. Couture Decl., at ¶ 2.

11.    Based on Noshirvan's prompting, his followers began harassing both Couture and GPS with hundreds of abusive and threatening communications. Couture Dep. (D.E. 476) at 389:4-390:1. Upon learning of Couture's employment at GPS, Noshirvan expressly incited his followers to expand their campaign to target GPS directly, stating that "**we're going after Garramone Plastic Surgery now**." GPS Dep. (D.E. 480) at 63:10-64:4, 91:16-19.

12.    Predictably, Noshirvan's followers began targeting GPS with hundreds of abusive communications and fictitious reviews on professional review websites such as Yelp and Google. GPS Decl., at ¶ 15. GPS's business website contact form was inundated with vulgar, threatening, and harassing messages from individuals who were not patients, many of which directly referenced Noshirvan's social media posts and links. *Id.*; Couture Decl., at ¶ 9; GPS Dep. (D.E. 480) at 25:19-23, 272:4-25; Couture Dep. (D.E. 476) at 290:3-18.

13.    The coordinated nature of the campaign against GPS is further evidenced by a screenshot of a conversation in which one of **Noshirvan's followers asks, "so we are now working on reviews for his business right?" and Noshirvan responds "Yes."** GPS Decl., at ¶ 16 (emphasis added). Noshirvan's followers then placed calls and made appointments for fake patients, placed negative Google reviews, and reported Dr. Garramone to the Board of Medicine. GPS Dep. (D.E. 480) at 63:25-64:7

6

### C.    Noshirvan's Conspiracy with A.O.[6] and his Followers

14.    Shortly after targeting Couture, Noshirvan began communicating with several individuals close to Couture and Dr. Garramone who provided Noshirvan with non-public private information about them. These persons included a former employee of GPS ("*A.O.*"). GPS Decl., at ¶¶ 8-12; Couture Decl., at ¶ 8.

15.    A.O. was formerly employed by GPS as a patient care coordinator for approximately 17 years. *See* GPS Decl., at ¶ 10. In that role, she developed relationships with patients and colleagues, and her seniority granted her practice-wide access and knowledge of GPS's business operations, including patient information, business information, and financial records. GPS Decl., at ¶ 8. A.O. was subject to a separation agreement and non-disclosure agreement ("*NDA*") that prohibited her from sharing confidential GPS information. GPS Decl., at ¶ 9.

16.    Despite her NDA, A.O. communicated with Noshirvan and provided him with non-public information about GPS. In messages produced by Noshirvan in the 1218 Case, A.O. told Noshirvan ████████████████████████

████████████████████████████████████████████

████████████████████████████. GPS Decl., at ¶ 10. A.O.

████████████████████████████████████████████

████████████████████████████████████████████

---

[6] A.O.'s full name is identified in GPS's deposition testimony. *See* GPS Dep. (D.E. 480) at 56:20-23.

██████████████████████ In a separate communication, A.O. confirmed "we all have" seen Noshirvan's lawsuit against GPS and that "we are all rooting for [Noshirvan]." GPS Decl., at ¶ 11.

17.    A.O. also directly messaged Noshirvan identifying herself as an "ex-employee of Ralph," providing Noshirvan with information about Couture and GPS personnel, and requesting that Noshirvan keep her identify anonymous. GPS Decl., at ¶ 12.

18.    Noshirvan also coordinated with his followers to target GPS. Specifically, Noshirvan communicated extensively with E.B.[7], an individual connected with Couture. In these messages, Noshirvan admitted that he "tricked 'Couture' into confirming her name," stating that he had "done this with 100s of people." GPS Decl., at ¶¶ 13-14.

### D. Results of Noshirvan's Campaign Against GPS

19.    Having incited his followers to target GPS (SOF, ¶¶ 12-14), Noshirvan escalated his campaign by using information from A.O. to further damage GPS's practice.  Noshirvan used information he received from A.O. to flood social media with mischaracterizations of GPS's statements and actions. As a result, many patients

---

[7] E.B.'s full name is identified in GPS's deposition testimony. *See* GPS Dep. (D.E. 480) at 122:7-14.

terminated scheduled procedures and ended their relationship with GPS. GPS Dep. (D.E. 480) at 25:1-4, 348:14-22; Jennifer Holliday's deposition at 142:19-143:5.[8]

20.    Noshirvan's campaign severely damaged GPS's reputation and caused financial harm. GPS lost relationships with physicians who became fearful of the reputational harm of being associated with GPS. GPS Dep. (D.E. 480) at 92:10-13, 321, 324:19-21, 328-29, 353:17-354:10 (testifying that Dr. Yee "left because of negative publicity generated by a number of defamatory videos that were published by Mr. Noshirvan").

21.    GPS had to hire security personnel and pay for enhanced security surveillance systems to be installed at its office location in Ft. Myers, Florida, as a result of the threats and harassment stemming from Noshirvan's campaign. GPS Decl., at ¶ 18.

22.    Noshirvan admitted that identifying and humiliating his targets was important so they receive the "accountability" Noshirvan feels they deserve. Noshirvan expressed zero concern for his victims when asked about the possibility that one of his victims might suffer as a result of his actions. Noshirvan 1218 Dep. (D.E. 473) at 17:7-25, 169:1-170:8.

23.    The harassment stemming from Noshirvan's campaign has continued for years. As recently as January 2026, GPS received threatening and abusive emails from

---

[8] The complete transcript of Holliday's deposition has been previously filed under seal at D.E. 375 in the 2018 Case and will be referred to herein as "Holliday Dep. (D.E. 375)."

individuals including messages telling Dr. Garramone to "[k]ill yourself," threatening that "[t]he walls are closing in" and "[y]our business will finally close and you will be rightfully imprisoned," and stating "[j]ustice is coming." GPS Decl., at ¶ 19.

24.    In response to Noshirvan's campaign, GPS engaged a non-employee, Joseph Camp ("*Camp*") to assist with online reputation management. Camp was not an employee of GPS. He was not on GPS's payroll, and GPS did not issue Camp a W-2 or Form 1099 at any time. GPS Dep. (D.E. 480) at 341:3-11; GPS Decl. at ¶ 21.

25.    Camp volunteered to help GPS mitigate the reputational harm caused by Noshirvan. Payments GPS made to Camp between May and July 2022 were made as a "thank you" for his help and to reimburse Camp for expenses related to reputation management. GPS Dep. (D.E. 480) at 224:6-16, 341:12-342:7, 344:12-17, 359:16-24.

26.    Camp's assistance to GPS was strictly limited to reputation management—specifically, removing harmful content from the internet that stemmed from Noshirvan's defamatory videos. GPS had no agreements, contracts, or formal arrangements with Camp beyond this limited role. GPS Decl., ¶ 22; GPS Dep. (D.E. 480) at 224:6-12.

27.    At no point did GPS, or anyone acting on its behalf, ask Camp or have an agreement with Camp or any other party to harass, cyberstalk, defame, inflict emotional distress on Noshirvan, or to interfere with Noshirvan's personal or business relationships. GPS Dep. (D.E. 480) at 342:11-343:13; GPS Decl., ¶ 23.

28.    The Court in the 1218 Case concluded that "[a]t most, the remaining evidence shows communications between Couture and Luthmann, and Trainor and

10

Camp, and suggests that Camp was hired by Garramone and Couture for reputation management . . . But not more." Order & Opinion, *Noshirvan v. Couture et al.*, No. 2:23-cv-1218-JES-KCD (M.D. Fla. Aug. 12, 2025) (D.E. 454 at 15-16).

**MEMORANDUM OF LAW**

**A.    Applicable Legal Standard**

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant is entitled to judgment as a matter of law." *Id.* In reviewing a motion for summary judgment, the Court is "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007)). Notably, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter," but only "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**B.    GPS is Entitled to Judgment as Matter of Law for Civil Conspiracy (Count II)**

Under Florida law, "[t]he essentials of a complaint for civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy,

11

and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Daley v. Bono*, 420 F. Supp. 3d 1247, 1256 (M.D. Fla. 2019) (quoting *Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cty.*, 616 So. 2d 562, 565 (Fla. 5th DCA 1993)). Put another way, "***[a]n action for civil conspiracy ordinarily requires proof of an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and resulting injury to the plaintiff***." *Bivens Garden Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 912 (11th Cir. 1998) (emphasis added). One must prove a civil conspiracy exists before addressing the underlying torts they raise. *Philadelphia Indem. Ins. Co. v. Hamic*, 2012 WL 5055558, at *1 (M.D. Fla. Oct. 18, 2012). The undisputed evidence conclusively establishes each element of GPS's civil conspiracy claim against Noshirvan.

First, the record demonstrates that Noshirvan entered into an agreement with A.O. and others, and directed his followers to conduct campaigns of online and telephonic harassment against GPS. A.O. provided Noshirvan with private and confidential information about GPS's business operations, its patients, and the personal lives of Dr. Garramone and Couture, and Noshirvan used this information to further his harassment campaign (SOF, ¶¶ 14-18). The agreement with A.O. is conclusively established by Noshirvan's own document production. Specifically, A.O. expressly told Noshirvan she was "on [his] side," that her former coworkers were "all on 'team Danesh,'" and offered to provide him with copies of her confidential separation agreement with GPS. (SOF, ¶ 16). A.O. went as far as directly messaging

12

Noshirvan to provide inside information about GPS while requesting anonymity. (SOF, ¶ 17).

Moreover, Noshirvan coordinated with multiple individuals to advance his campaign against GPS and Couture. His communications with E.B. further demonstrate the breadth of his conspiracy. In messages with E.B., Noshirvan admitted to tricking Couture into confirming her identity and sought additional personal information about Couture to use in his campaign. (SOF, ¶ 18).

Separately, Noshirvan expressly incited his followers to target GPS, and his followers acted in concert with him by flooding GPS with fictitious negative reviews and abusive communications. (SOF, ¶¶ 12-13). Indeed, the record includes a screenshot of a conversation between Noshirvan and one of his followers in which the follower asks, "so we are now working on reviews for his business right?" and Noshirvan responds "Yes." (SOF, ¶ 13).

Second, the unlawful objective of the conspiracy is undisputed. Noshirvan, A.O., and Noshirvan's followers acted in concert to tortiously interfere with GPS's business relationships and to damage GPS's business and professional reputation through misrepresentations, fictitious reviews, and improper use of confidential business information—all because GPS did not terminate Ms. Couture's employment as Noshirvan believed it should have done for purposes of "accountability". (SOF, ¶ 22). The conspiracy's objective—tortious interference with GPS's existing business relationships—is actionable under Florida law and constitutes the underlying tort supporting GPS's civil conspiracy claim.

Third, the overt acts in furtherance of the conspiracy are extensive and undisputed. Noshirvan published multiple videos targeting GPS between January and July 2022, inciting his followers to flood GPS with fictitious reviews and abusive communications and used confidential information provided by A.O. to contact GPS's patients. (SOF, ¶¶ 10-13, 19). Noshirvan's incitement of his followers amplified the reach and destructive impact of the conspiracy far beyond what any individual actor could accomplish alone. As the U.S. Court of Appeals for the Tenth Circuit recognized, social media threats and incitement "have the ability to reach a vast audience—far more than the traditional speaker or author published in a single venue" and "such exhortations may often find a receptive audience of like-minded individuals—perhaps audiences willing to do the bidding of one urging violent action." *United States v. Wheeler*, 776 F.3d 736, 745 n.4 (10th Cir. 2015); *see also United States v. Murfin*, No. 25-CR-463-GKF, D.E. 28 at 6 (N.D. Okla. Mar. 31, 2026) (applying *Wheeler* in context of social media incitement).  Indeed, the Court in the 1218 Case found that Noshirvan's communications were "intentionally made to incite followers to engage in foreseeable harassment and intimidation" and that, "[p]redictably, Noshirvan's communications led to harassment." Opinion & Order, *Noshirvan v. Couture, et al.¸* No. 2:23-cv-1218-JES-KCD (M.D. Fla. Aug. 12, 2025) (D.E. 454 at 25, 30). Such is the case here. Each of the overt acts was prompted by Noshirvan and executed through Noshirvan's coordinated direction of his followers.

Fourth, GPS sustained damages as a direct and proximate result of the conspiracy. GPS's reputation was damaged, patients terminated scheduled procedures

14

and ended their relationship with the practice, a physician employed by GPS left the practice due to the reputational harm caused by Noshirvan's campaign, and GPS incurred security costs. (SOF, ¶¶ 19-21). *See also Ewing v. Selling Source, LLC*, 2010 WL 11507596, at *3 (M.D. Fla. Mar. 5, 2010) ("[T]he damage element of a civil conspiracy claim is satisfied where the plaintiff demonstrates damages flowing from the overt acts committed in pursuance of the conspiracy").

Accordingly, because each element of GPS's civil conspiracy claim is conclusively established by the undisputed record evidence, GPS is entitled to partial summary judgment on liability for Count II.

## C.    GPS is Entitled to Judgment as Matter of Law on its Tortious Interference Claim (Count III)

To succeed on a tortious interference with a business relationship claim, GPS must prove: "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*, 310 So. 3d 45, 49 (Fla. 4th DCA 2020). The undisputed facts establish each element of this claim.

First, as to the existence of GPS's business relationship, GPS must demonstrate "an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Christian Tennant Custom Homes of Fla., Inc. v. EBSCO Gulf Coast Dev., Inc.*, 2017 WL 4102458, at *7 (N.D. Fla. Sept. 15, 2017) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814

(Fla. 1994)). A business relationship does not require a contract but does require "an understanding between the parties [that] would have been contemplated had the defendant not interfered." *Ethan Allen, Inc.*, 647 So. 2d at 814. Further, a medical practice's relationship with its existing patients constitutes protectable business relationships for the purposes of a tortious interference claim. *See Deligdish v.* Bender, 2023 WL 5016547, at *9 (M.D. Fla. Aug. 7, 2023) (holding allegations of interference with identifiable business relationships, although unnamed, are sufficient); *see also KLS Martin, Inc. v. Medical Modeling, Inc.*, 2018 WL 8139133, at *8 (M.D. Fla. Dec. 17, 2018) (to state a claim for tortious interference, "no particular contract need be evidenced. A plaintiff must only show that 'an understanding between the parties would have been completed had the defendant not interfered.'")

Here, it is undisputed that GPS maintained established business relationships with both physicians employed by the practice and existing patients who had scheduled appointments and procedures with GPS. *See* GPS Dep. (D.E. 480) at 93:21-94:2. Indeed, GPS's patients are specific individuals with existing treatment relationships. The fact that GPS cannot publicly disclose the names of these patients due to its obligations under the Health Insurance Portability and Accountability Act ("**HIPAA**") does not render these relationships unprotectable. On the contrary, HIPAA's protections highlight the confidential and individualized nature of the business relationship. Notably, Noshirvan's counsel refused to enter into a stipulated protective order in this case, and a protective order was entered over counsel's objection in the 1218 Case.

16

Second, it is undisputed that Noshirvan knew of GPS's business relationships as they were open and obvious. Noshirvan's own social media posts demonstrate that he was aware of GPS's business relationships and purposefully targeted those relationships. Specifically, Noshirvan expressly incited his followers to target and harass GPS, stating words to the effect of "we're going after Garramone Plastic Surgery now." (SOF, ¶ 11). Noshirvan plainly knew of GPS's business relationships and targeted them with precision.

Third, the record clearly demonstrates that Noshirvan intentionally and unjustifiably interfered with GPS's business relationships. As a matter of law, an interference is inherently "unjustified" if the interfering defendant is a "stranger to the business." *See Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014). Noshirvan is undeniably a stranger to GPS's medical practice, staff, and the business relationships GPS has with its patients. Indeed, Noshirvan had no professional or business relationship with GPS, no relationship with GPS's patients or physicians, and no legitimate interest in GPS's business operations. (SOF, ¶ 6).

Noshirvan's interference was improper because it involved, at a minimum, misrepresentations and improper conduct. Noshirvan knowingly mischaracterized information provided to him by A.O. about GPS and publicized the mischaracterized information to suggest GPS was engaged in improper acts. (SOF, ¶¶ 19). Noshirvan published fictitious defamatory content designed to look like real news articles to maximize GPS's reputational damage. (SOF, ¶ 12). Moreover, Noshirvan incited his followers to create fictitious negative reviews on Yelp and Google. Such reviews were

17

plainly false, as they were posted by individuals who were not current or former patients. (SOF, ¶ 12-13). *See Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc.*, 2019 WL 277733, at *9 (M.D. Fla. Jan. 22, 2019) (interference by "misrepresentation, intimidation, conspiratorial conduct, illegal conduct, and threats of illegal misconduct" is improper as a matter of law). Noshirvan's interference is independently improper because he is a complete "stranger to the business" and he acted with no legitimate purpose. *See Hamilton*, 6 F. Supp. 3d at 1320. In other words, Noshirvan knew that GPS maintained business relationships with current patients, yet Noshirvan knowingly interfered with those relationships through relentless and unjustified harassment efforts.

Fourth, GPS suffered damages as a direct result of Noshirvan's interference. Patients terminated scheduled procedures and ended their relationship with GPS after being targeted by Noshirvan and his followers. (SOF, ¶ 19). A physician employed by GPS left the practice due to Noshirvan's campaign. (SOF, ¶ 20). GPS also incurred costs for security personnel and enhanced surveillance systems at its office. (SOF, ¶ 21). *See Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533, 1542 (11th Cir. 1993), *certified question answered,* 647 So. 2d 812 (Fla. 1994) (affirmed that evidence of customers canceling existing orders after a manufacturer published a damaging newspaper advertisement was sufficient to support that advertisement caused dealer's lost profits on existing orders, as required to support tortious interference claim).

18

Accordingly, because each element of GPS's tortious interference claim is established by undisputed evidence, GPS is entitled to judgment as a matter of law on liability for Count III.

**D.     Noshirvan's Affirmative Defenses and Defenses Are Without Merit**

Noshirvan asserts thirteen (13) affirmative defenses and nine (9) defenses in this action that are, in substance, duplicative of the claims he asserted against GPS in the related 1218 Case.  Further, as a threshold matter, many of Noshirvan's affirmative defenses are legally insufficient, irrelevant to GPS's claims, and insufficiently pleaded under the standards set forth in *Iqbal/Twombly*. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007). Noshirvan's principal affirmative defenses—unclean hands, justification, and intervening or superseding causation—are all based on the theory that GPS conspired with Joey Camp and others to harass, defame, and inflict emotional distress on Noshirvan. (D.E. 115, Affirmative Defenses ¶¶ 6, 8, 13). These are identical to the allegations Noshirvan asserts as claims in the 1218 Case and are equally unsupported here.

As set forth in the Statement of Undisputed Facts, the undisputed evidence conclusively establishes that GPS's only engagement of Camp was for the limited purpose of online reputation management, including removing harmful content from the internet stemming from Noshirvan's campaign. Camp was not an employee of GPS, GPS did not monitor or direct Camp's activities, and GPS had no agreement with Camp or anyone else to harm Noshirvan in any way. (SOF, ¶¶ 24-27). The Court in the 1218 Case has already concluded that evidence presented at an evidentiary

19

hearing showed that Camp "was hired by Garramone and Couture for reputation management . . . but not more." (SOF, ¶ 28).

Moreover, Noshirvan's defense of intervening and superseding causation likewise fails. Noshirvan contends that the acts of third parties—*i.e.*, his own followers—were "not reasonably foreseeable" and therefore constitute a superseding cause. (D.E. 115, Affirmative Defense ¶ 18). To the contrary, the undisputed evidence shows that Noshirvan specifically directed and incited his followers to target GPS, that his followers acted in concert with him, and that the resulting harassment was entirely foreseeable. (SOF, ¶¶ 11-13). Indeed, this Court has recognized that "[m]any of [Noshirvan's] millions of followers then harass the person" he targets. (D.E. 81 at 2). The Court in the 1218 Case also concluded that the evidence showed that Noshirvan's communications were "intentionally made to incite followers to engage in *foreseeable* harassment and intimidation" and that "[p]redictably, Noshirvan's communications led to harassment." *See* Opinion & Order, *Noshirvan v. Couture, et al.,* No. 2:23-cv-1218-JES-KCD (M.D. Fla. Aug. 12, 2025) (D.E. 454 at 25, 30) (emphasis added).

Noshirvan's followers' conduct was entirely predictable and intentional. Indeed, the undisputed evidence confirms that GPS satisfied each element of its claims. Noshirvan's affirmative defenses do not create a genuine issue of material fact.

Similarly, Noshirvan's separately enumerated defenses fail to create a genuine issue of material fact. Noshirvan's defenses include, among other things, assertions that GPS's claims are barred by the First Amendment, that Noshirvan's statements were protected opinion, and that GPS failed to mitigate its damages. To the extent that

Noshirvan's defenses overlap with his affirmative defenses, they fail for the same reasons stated above. To the extent they raise distinct legal theories, they are unsupported by the undisputed record and insufficient to preclude summary judgment on the issue of liability.

Noshirvan's First Amendment defense is unavailing because the First Amendment does not protect speech that is used as a vehicle for tortious conduct. *See United States v. Clum*, 607 F. App'x 992, 928 (11th Cir. 2015) ("[s]peech that could have First Amendment protection is not protected speech, if it is part of 'a single and integrated course of conduct,' which violates the law." Noshirvan's coordinated campaign to flood GPS with fictitious reviews and incite his followers to place fake appointments goes far beyond the expression of any opinion and constitutes tortious conduct actionable under Florida law. Noshirvan's failure-to-mitigate defense is equally without merit, as the undisputed evidence demonstrates that GPS took reasonable steps to mitigate the harm caused by Noshirvan's campaign, including engaging Camp for reputation management services. (SOF, ¶¶ 25-27). None of Noshirvan's defenses create a genuine issue of material fact sufficient to preclude summary judgment.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment on the issue of liability as to Counts II and III of GPS's claim. GPS respectfully requests that the Court enter judgment on liability in GPS's favor, with the amount of damages and issuance of injunctive relief to be determined at trial.

21

DATED: May 22, 2026

Respectfully submitted,

/s/ Julian A. Jackson-Fannin
Harvey W. Gurland, Jr., Esq.
Florida Bar No. 284033
Julian A. Jackson-Fannin, Esq.
Florida Bar No. 93220
DUANE MORRIS LLP
201 South Biscayne Boulevard
Suite 3400
Miami, FL 33131
Tel: 561.962.2108
HWGurland@duanemorris.com
JJFannin@duanemorris.com
PNMendoza@duanemorris.com

*Counsel for Plaintiff Ralph Garramone M.D., P.A., d/b/a Garramone Plastic Surgery*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd of May, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.

/s/ Julian A. Jackson-Fannin
Julian A. Jackson-Fannin, Esq.

DM1\301870904.2

22